# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PAMELA REILLY, as Personal Representative
for the Estate of ROSEMARIE REILLY,

     Plaintiff,

vs.

OTTAWA COUNTY, a Municipal
Corporation; OFFICER BRANDON
TUBERGEN, in his individual capacity;
SERGEANT CHRIS DILL, in his individual
capacity; POLICE OFFICER COLLIN
WALLACE, in his individual capacity;
SERGEANT DENNIS LUCE, in his individual
capacity; CAPTAIN BRANDON DEHAAN,
In his individual capacity; and SEAN
KELLEY, in his individual capacity,

     Defendants.

Case No. _____
Hon. _____

---

James B. Rasor (P43476)
Andrew J. Laurila (P78880)
**Rasor Law Firm, PLLC**
Attorneys for *Plaintiff*
201 E 4th Street
Royal Oak, MI 48067
(248) 543-9000/(248) 543-9050 (fax)
jbr@rasorlawfirm.com
ajl@rasorlawfirm.com

---

## COMPLAINT AND JURY DEMAND

     **NOW COMES** Plaintiff, PAMELA REILLY, as Personal

Representative for the Estate of ROSEMARIE REILLY, by and through her

1

attorneys, RASOR LAW FIRM, PLLC, and for her Complaint against the above-named Defendants, jointly and severally, states as follows:

## JURISDICTION AND VENUE

1.      This cause of action is brought pursuant to 42 U.S.C. § 1983, as well as the Fourteenth Amendments to the United States Constitution, and pendant claims arising under the laws of the State of Michigan.

2.      This Court has jurisdiction over the claims arising under federal law pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367.

3.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as this cause of action arose within the Western District of Michigan.

## PARTIES

4.      Plaintiff, Pamela Reilly, is, and was at all times relevant hereto, a citizen of the United States and a resident of the City of New Baltimore, County of Macomb, State of Michigan.

5.      Plaintiff is the mother and duly appointed Personal Representative of Rosemarie Reilly, deceased, and brings suit in her representative capacity as the Personal Representative of the estate.

6.      Rosemarie Reilly was at all times relevant hereto a citizen of the United States.

2

7. Defendant Ottawa County was at all times relevant hereto, a body politic and Municipal corporation organized under the laws of the State of Michigan and is responsible for the operation of the Ottawa County Sheriff's Department (herein "OCSD").

8. At all times material and relevant hereto, Defendant Brandon Tubergen was an officer of the Ottawa County Sheriff's Department and was acting under the color of state law and in the course and scope of his employment. He is sued in his in his individual capacity.

9. At all times material and relevant hereto, Defendant Chris Dill was a Sargent for the Ottawa County Sherriff's Department and was acting under the color of state law and in the course and scope of his employment. He is sued in his individual capacity.

10. At all times material and relevant hereto, Defendant Collin Wallace was a police officer for the Grand Valley State Police Department and was acting under the color of state law and in the course and scope of his employment. He is sued in his individual capacity.

11. At all times material and relevant hereto, Defendant Brandon DeHaan was a Captain for the Grand Valley State Police Department and was acting under the color of state law and in the course and scope of his employment. He is sued in his individual capacity.

3

12.     At all times material and relevant hereto, Defendant Dennis Luce was a Sargent for the Ottawa County Sheriff's Department and was acting under the color of state law and in the course and scope of his employment. He is sued in his individual capacity

13.     At all times material and relevant hereto, Defendant Sean Kelley was an officer for the Bloomfield Township Police Department and the father of Jeremy Kelley. He is sued in his individual capacity.

## COMMON FACTUAL ALLEGATIONS

14.     Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 13, as if fully set forth herein.

15.     Plaintiff, Pamela Reilly ("Pam"), is the mother of decedent Rosemarie Reilly.

16.     Rosemarie was shot and killed at approximately 3:00 a.m. on November 6, 2016 by her ex-boyfriend, Jeremy Kelley (herein "Jeremy").

17.     Rosemarie and Jeremy were in a romantic relationship while Rosemarie attended college at Grand Valley State University.

18.     Upon information and belief, Rosemarie and Jeremy's relationship ended on or about the second week in September of 2016.

19.     On or about October 1, 2016, Rosemarie spoke to her mother and explained that she and Jeremy were still living together, which caused her

4

significant problems, and discussed her desire to move out of the residence that she and Jeremy shared.

20.    On or about October 5, 2016, Jeremy was admitted to the Holland Hospital after attempting to commit suicide, telling Rosemarie that he had a gun to his head and was going to shoot himself.

21.    Upon information and belief, Rosemarie was unable to locate Jeremy when he threatened suicide on October 5, but was able to speak to Jeremy's father, Defendant Sean Kelley, who tracked Jeremy's phone so that police could locate him.

22.    While attempting to locate Jeremy, Defendant Sean Kelley spoke on multiple instances with Defendant Wallace along with other Grand Valley State police officers.

23.    After getting out of the hospital following his October 5 suicide threat, Jeremy began stalking and harassing Rosemarie.

24.    Upon information and belief, Jeremy contacted Rosemarie repeatedly on October 7, 2016, and his statements to her made her believe that he was going to try and attempt suicide again.

25.    In part to avoid Jeremy's constant harassment after his suicide attempt, Rosemarie stayed at the apartment of her friend, Shelby Gird, and also at the house of her aunt and uncle, Noreen and David Rose.

5

26.     Upon information and belief, on or about the early morning of October 8, 2017, Jeremy attempted to locate Rosemarie by calling Pam pretending to be Jeremy's boss, "Chad," and telling Pam that Jeremy had been taken to the hospital and that he needed Shelby's phone number so he could contact Rosemarie to obtain medical information for Jeremy.

27.     These statements were lies and disturbing to Rosemarie.

28.     On or about October 8, 2016, Rosemarie met her mother, Pam, for a late lunch, Pam observed that Rosemarie had a crooked nose and facial bruises, and Pam took Rosemarie to the hospital for treatment, where it was determined that she had suffered a broken nose.

29.     At approximately 5:00 p.m. on or about October 8, 2016, Jeremy admitted to Pam during a phone conversation that he had hurt Rosemarie.

30.     After leaving the hospital on October 8, 2016, Rosemarie called her father, John, and told him that during an argument with Jeremy, after he physically prevented her from leaving, Jeremy punched her in the face, arms, and legs several times, causing her broken nose among other injuries.

31.     From October 8, 2016 through October 11, 2016, Jeremy called Rosemarie approximately forty three (43) times.

RASOR LAW FIRM, PLLC

32.    On or about October 11, 2016, Jeremy went to the house of Rosemarie's aunt and uncle, Noreen and David Rose, asking to see Rosemarie repeatedly, but was told she was not there.

33.    After failing to locate Rosemarie on October 11, Jeremy called David Rose at approximately 11:10 p.m. and again threatened to kill himself, stating that he had a gun to his head.

34.    After being told by Jeremy that he was holding a gun to his head, David called 911 and, upon information and belief, reported Jeremy's actions to Defendant Ottawa County Sheriff's Department.

35.    Upon information and belief, an officer from Defendant Ottawa County Sheriff's Department acting on David's report that Jeremy threatened suicide contacted Jeremy by telephone, but the police took no further action regarding Jeremy's suicide attempt threat.

36.    After the October 11 suicide threat, Jeremy continued stalking Rosemarie. On or about October 12, 2016, Jeremy came to Grand Valley State University's campus, where Rosemarie was a student, and jumped in front of Rosemarie's car before pounding on the window and head-butting her vehicle.

37.    On or about October 12, 2016, Rosemarie contacted GVSU's Police Department and reported Jeremy for stalking, domestic violence/abuse, and for putting a gun to her head and threatening to kill her.

7

38.     Rosemarie made her report to Defendant Wallace of the GVSU Police Department, who then contacted Defendant Ottawa County Sheriff's Department, who dispatched Defendant Dill to the GVSU campus to give Rosemarie paperwork required for filing a Personal Protection Order ("PPO").

39.     Defendant Dill encouraged Rosemarie to file the PPO.

40.     Defendant Wallace completed a "no trespassing" form for Jeremy along with creating an incident report based on stalking arising from the circumstances Rosemarie told him about; he also affirmatively suggested Rosemarie file a PPO against Jeremy.

41.     Upon information and belief, on or about October 13, 2016, Defendant Tubergen of the OCSD visited Jeremy at Jeremy's home and told Jeremy to leave Rosemarie alone.

42.     He did this based on Rosemarie's desire to file the PPO.

43.     Sometime after he visited Jeremy on October 13, 2016, Officer Tubergen called Pam and told her that there was nothing that could be done to prevent Jeremy from calling Rosemarie, that he had seen Jeremy's guns and that Jeremy was legally allowed to own those guns, and that he was "well aware" that Jeremy's father, Sean Kelley, was a police officer.

8

44.    At all times material and relevant, Jeremy's father, Sean Kelley, was a Patrol Officer with the Bloomfield Township Police Department in Bloomfield Township, Michigan.

45.    During the October 13, 2016, telephone conversation, Pam told Defendant Tubergen that Jeremy had held a gun to Rosemarie's head and threatened to kill her with it. In response, Officer Tubergen told Pam that Rosemarie needed to file a report.

46.    Upon information and belief, in response to Officer Tubergen's direction, on or about October 13, 2016, Rosemarie reported that Jeremy held a gun to her head and threatened to kill her to Defendant Chris Dill.

47.    Also on October 13, 2016, Defendant Dill informed Jeremy over the telephone that he was not going to take Jeremy to jail despite his desire to question him regarding Rosemarie's complaint of domestic violence.

48.    In the same telephone conversation with Jeremy, Jeremy informed Defendant Dill that he was upset Rosemarie had called the police and he believed she had obtained a PPO at that time.

49.    Defendant DeHaan reviewed both Defendant Wallace's and Dill's reports on October 13.

50.    Pam also called and spoke with Defendant DeHaan on October 13, 2016, wherein she informed him about Jeremy's stalking behavior, that Jeremy

9

had several guns and was very unpredictable, and that she was concerned about Jeremy's father, Defendant Kelley, offering Jeremy bad advice regarding the situation with Rosemarie.

51. Defendant DeHaan informed Pam that he would follow up on the incident.

52. Defendant DeHaan spoke to Jeremy on the morning of October 13, 2016. During this phone conversation, he informed Jeremy he was inquiring into a report made about him by Rosemarie.

53. Defendant DeHaan also told Jeremy that because of his earlier actions he was banned from GVSU property, was not allowed on to enter any GVSU property, and not to contact any of the Reilly family members by phone, e-mail or any other electronic means as they do not wish to contact him.

54. On or about October 16, 2016, Pam Reilly spoke with Defendant Luce about the need to retrieve Rosemarie's belongings from Jeremy's residence and expressed concerns about Jeremy's possession of firearms, which she informed Defendant Luce Jeremy had previously threatened to kill Rosemarie with.

55. Upon information and belief, at the time of this October 16 phone conversation, Sgt. Luce knew that Jeremy's dad was a West Bloomfield police

officer, had spoken to him, and stated that Jeremy was allowed to have guns and that there was no cause to remove them.

56.    Pam called and spoke to the Ottawa County Sherriff's Department that day and asked them to meet Rosemarie and herself at Jeremy's trailer to retrieve her belongings.

57.    Upon information and belief, Jeremy's father, Defendant Kelley, had spoken with officer(s) from Defendant OCSD prior to this encounter and on behalf of his son.

58.    Upon arriving at Jeremy's trailer, Jeremy and an officer from Defendant OCSD were cordially standing in the parking lot waiting.

59.    The officer initially was not going to supervise Rosemarie's removal of her things inside the trailer, was going to permit Jeremy and Rosemarie to be alone while she removed her things, and only did so upon request of the Reilly's.

60.    On or about October 17, 2016, Rosemarie paid for the PPO and picked it up from the Kent County courthouse, signed by Judge Daniel Zemaitis. The PPO ordered that Jeremy was prohibited from, among other conduct: entering Rosemarie's residence, entering onto GVSU property, following Rosemarie, and contacting Rosemarie by phone or Facebook.

11

61. On or about October 18, 2016, Jeremy called Rosemarie three times despite Rosemarie attempting to block Jeremy's phone.

62. On or about October 19, 2016, Rosemarie contacted the GVSU police and reported to Defendant Wallace that Jeremy continued to call her and stalk her by entering onto the GVSU campus and following Rosemarie with his vehicle until she ran into a dining hall, where she called the police from.

63. On multiple instances Pam called the GVSU police expressing fear for both her daughters, specifically Rosemarie, as her other daughter Jennifer was with Rosemarie at the time.

64. Upon information and belief, officers from the GVSU Police Department went to Rosemarie's sister, Jennifer Reilly's, dorm room to check on Rosemarie after Pam Reilly called the GVSU police to tell them that Jeremy was violating the PPO.

65. Despite Jeremy's continued stalking of Rosemarie and Rosemarie's reports, no one attempted to arrest Jeremy.

66. Upon information and belief, during a telephone conversation that occurred on or about October 20, 2016, Jeremy's father, Defendant Sean Kelley, told Pam that Rosemarie was a liar and that they (Pam and John) needed to stop calling the police on Jeremy.

67. Upon information and belief, sometime during the last week of October 2016, Jeremy told Rosemarie and Jennifer Reilly that Jeremy's dad, Defendant Sean Kelley, had spoken to the local police and that "nothing was going to happen" to Jeremy for violating the PPO.

68. Rosemarie emailed Defendant Wallace on or around October 22, 2016, to which she explained that since they had last spoken when she informed him she obtained the PPO, Jeremy had tried to contact her 86 times through her phone, left her multiple voicemails, and emailed her University email address on multiple instances.

69. A warrant was prepared by Defendant OCSD for Jeremy's arrest on October 28, 2016, arising out of Rosemarie's report of domestic violence.

70. Pursuant to Defendant OCSD's policies, this warrant was mailed to Jeremy's residence.

71. Upon information and belief, Defendant Wallace mailed Jeremy a different warrant for his arrest on or around November 2, 2016, arising out of Rosemarie's complaint of his stalking to GVSU PD.

72. On or about November 4, 2016, Pam Reilly accompanied Rosemarie to a Grand Rapids garage to retrieve some of Rosemarie's personal belongings that were stored there.

13

73. While at the garage, Pam called 911 after believing she saw Jeremy and asked the police to send an officer out while Rosemarie removed her belongings from the garage.

74. The police refused to come to the garage, and because the garage manager would not unlock the garage without Jeremy being present, Pam and Rosemarie left.

75. The following day, on or about November 5, 2016, Jeremy spoke with John Reilly on the telephone and told John that he was with his brother, Ryan Kelley, in Muskegon and would not be able to come open the garage. Jeremy further stated that he was aware that he had warrants out for his arrest, and John encouraged Jeremy to turn himself in and cooperate with the police.

76. Upon information and belief, either Jeremy's father or one of the Defendant police officers in the area also informed Jeremy he had a warrant for his arrest relating to the domestic violence incident but did not effectuate his arrest.

77. Upon information and belief, on or about November 6, 2016, Jeremy found Rosemarie at a friend's house located at 1450 Lake Dr. SE, Grand Rapids, MI 49605, and, at approximately 3:00 a.m., dragged Rosemarie from the residence by her hair, shot her multiple times in the torso with a black

14

9 mm Beretta pistol when she attempted to flee back into the house, then shot himself in the head.

78.     Rosemarie, whose condition was noted by police as indicating that she had been involved in a struggle, was pronounced dead at the scene at approximately 3:22 a.m.

79.     Jeremy, who upon information and belief was not deceased when police arrived, was transported to St. Mary's Hospital and was later pronounced dead from his injuries at approximately 3:42 a.m.

80.     Upon information and belief, Defendants knew that Jeremy had a handgun in his possession yet permitted him to continue to possess the handgun despite continual knowledge of his prior threats of shooting Rosemarie.

81.     Defendants knew of Jeremy's propensity for violence yet did nothing to protect Rosemarie Reilly.

82.     The risk that Jeremy Kelley was out of control and dangerous to Rosemarie Reilly was obvious and known by Defendants.

83.     Upon information and belief, it was told or communicated to local police that "nothing was going to happen" to Jeremy Kelley for violating his personal protection order.

84.     Upon information and belief, local police, including the individually named Defendant officers, listened and acquiesced to Jeremy's father when he requested leniency for his son.

85.     In the month preceding Rosemarie's death, Defendants put Jeremy on notice that he should stay away from Rosemarie (i.e. she made a police complaint about him), that Rosemarie filed a PPO against him, and that he had arrest warrant(s) out for his arrest relating to the stalking and the domestic violence charge.

86.     Defendants encouraged Rosemarie to file the PPO.

87.     Jeremy's father's communications with the Defendant Officers, and the Officers' ensuing refusal to arrest and/or remove his guns, boldened Jeremy's belief that "nothing was going to happen" him, which in turn led to Rosemarie's death.

88.     Defendants' regular communication with Jeremy, especially but not limited to after he continually violated the signed PPO, boldened his belief that "nothing was going to happen" him, which in turn led to Rosemarie's death.

89.     The Defendants used apparent authority and refrained from arresting Jeremy Kelley for violating his protection order on four (4) separate occasions.

16

90.     The Defendants actions constitute an affirmative act that either created the risk or increased the risk of danger to Rosemarie Reilly placing her in substantial risk of serious immediate and proximate harm which was the cause of her death.

91.     The Defendants affirmative actions are outrageous and shock the conscience.

## COUNT I
## FOURTEENTH AMENDEMENT VIOLATIONS UNDER
## 42 U.S.C. § 1983 AS TO (ALL/INDIVIDUAL) DEFENDANTS

92.     Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 91, as if fully set forth herein.

93.     This action is brought pursuant to 42 U.S.C. § 1983 against Defendants in their individual capacities for depriving Plaintiff of her constitutionally protected due process interest, under color of law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

94.     Plaintiff's decedent had a clearly established right, under the Fourteenth Amendment to the United States Constitution, to be free from danger created by the state.

95.     The acts and/or omissions of Defendants, constituted deliberate indifference to Plaintiff's right, in violation of the Fourteenth Amendment.

17

96. These claims are cognizable under 42 U.S.C. § 1983.

97. As a result of Defendants' conduct complained of herein, Plaintiff suffered deprivation of clearly established and well-settled rights protected and secured by the Fourteenth Amendment to the United States Constitution.

98. Defendants, individually, were deliberately indifferent to Plaintiff's decedent, which was a proximate cause of her death and conscious suffering.

99. Defendants are not entitled to governmental or qualified immunity.

100. Pursuant to 42 U.S.C. § 1983, Defendants are liable to Plaintiff for all damages allowed under federal law. To the extent that the damages allowable and/or recoverable are deemed insufficient to fully compensate Plaintiff and/or to punish or deter the Defendants, this Court must order additional damages to be allowed so as to satisfy any and all such inadequacies. Defendants' conduct was and remains extreme and outrageous subjecting Defendants to punitive damages.

101. As a result of the Defendants' actions and/or omissions, Plaintiff has the following damages:

    a.    Special damages in the form of medical, funeral, and burial expenses;

    b.    Compensatory damages;

RASOR LAW FIRM, PLLC

c. Conscious pain and suffering;

d. Loss of companionship;

e. Punitive damages;

f. All damages allowable under Michigan law, including but not limited to the Michigan Wrongful Death Act, M.C.L. § 600.2922;

g. All damages allowable under Federal law, including but not limited to 42 U.S.C. § 1983; and

h. Reasonable costs and attorney's fees under 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff Pamela Reilly, as Personal Representative of the Estate of Rosemarie Reilly, prays for a judgment against Defendants, jointly and severally, including punitive damages and attorney's fees and costs pursuant to 42 U.S.C. § 1988, and all allowable interest thereon.

## COUNT II
## MUNICIPAL LIABILITY AS TO DEFENDANT OTTAWA COUNTY

102. Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 101, as if fully set forth herein.

103. Defendant Ottawa County's liability as a municipality arises out of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

104. Defendant Ottawa County through their policy making officials:

a. Failed to establish, implement, and/or execute adequate policies, procedures, rules and regulations to protect individuals, such as Rosemarie Reilly, from individuals with violent tendencies or who had PPOs against them;

19

b.   Failed to establish, implement, and/or execute adequate policies, procedures, rules and regulations to protect individuals, such as Rosemarie Reilly, from individuals against whom arrest warrants had been issued.

c.   Defendant's policy, procedures, regulations, and customs, and/or its failure to enact the same, caused and was the driving force behind the violations of Plaintiff's constitutional rights as alleged in this Complaint.

d.   Failing to properly train its employees, including the above-named Defendant.

e.   Failed to establish, implement, and/or execute adequate policies, procedures, rules and regulations that ensured officers from different police departments—Defendant Kelley—could improperly influence investigations and/or police conduct.

105.   At all times material hereto, Defendant Ottawa County, through its agents, was deliberately indifferent to the strong likelihood that constitutional violations, such as those in the instant case, would occur, and pursued policies, practices, and customs that were a direct and proximate cause of the deprivations of Plaintiff's decedent's constitutional rights.

106.   These claims are cognizable under 42 U.S.C. § 1983.

107.   The customs, policies and/or practices of Defendant Ottawa County were a proximate cause of the death and conscious suffering of Plaintiff's decedent for the aforementioned reasons.

108.   As a result of the Defendants' actions and/or omissions, Plaintiff has the following damages:

a.   Special damages in the form of medical, funeral, and burial expenses;

b.   Compensatory damages;

c.   Conscious pain and suffering;

d.   Loss of companionship;

e.   Punitive damages;

f.   All damages allowable under Michigan law, including but not limited to the Michigan Wrongful Death Act, M.C.L. § 600.2922;

g.   All damages allowable under Federal law, including but not limited to 42 U.S.C. § 1983; and

h.   Reasonable costs and attorney's fees under 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff Pamela Reilly, as Personal Representative of the Estate of Rosemarie Reilly, prays for a judgment against Defendants, jointly and severally, including punitive damages and attorney's fees and costs pursuant to 42 U.S.C. § 1988, and all allowable interest thereon.

## COUNT III
## WRONGFUL DEATH AS TO DEFENDANTS TUBERGON, DILL, LUCE, WALLACE, DEHAAN AND KELLEY

109.   Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 108, as if fully set forth herein.

110.   Plaintiff's decedent suffered injuries resulting in death caused by Defendants' wrongful conduct, and if death had not ensued, Plaintiff's

21

decedent would have been entitled to maintain an action and recover damages. MCL § 600.2922.

111. The Defendants' aforementioned acts and/or omissions were a proximate cause of Plaintiff's decedent's death.

112. The acts and/or omissions of Defendants Brandon Tubergen, Chris Dill, Dennis Luce, Collin Wallace, Brandon DeHaan and Sean Kelley constituted gross negligence under state law.

113. The acts and/or omissions of Defendants Brandon Tubergen, Chris Dill, Dennis Luce, Collin Wallace, Brandon DeHaan and Sean Kelley were intentional, wanton and willful, and/or grossly negligent and Defendants are therefore not entitled to governmental immunity under state law, MCL § 691.1407.

114. Defendants' gross negligence was a proximate cause of the injuries, including the death of Plaintiff's decedent.

115. As a result of the Defendants' actions and/or omissions, Plaintiff has the following damages:

    a. Special damages in the form of medical, funeral, and burial expenses;

    b. Compensatory damages;

    c. Conscious pain and suffering;

    d. Loss of companionship;

22

e.   Punitive damages;

f.   All damages allowable under Michigan law, including but not limited to the Michigan Wrongful Death Act, M.C.L. § 600.2922;

g.   All damages allowable under Federal law, including but not limited to 42 U.S.C. § 1983; and

h.   Reasonable costs and attorney's fees under 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff Pamela Reilly, as Personal Representative of the Estate of Rosemarie Reilly, prays for a judgment against Defendants, jointly and severally, including punitive damages and attorney's fees and costs pursuant to 42 U.S.C. § 1988, and all allowable interest thereon.

## COUNT IV
## CIVIL CONSPIRACY AS TO DEFENDANTS TUBERGON, DILL, LUCE, WALLACE, DEHAAN AND KELLEY

116.   Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 115, as if fully set forth herein.

117.   Defendants Tubergon, Dill, Luce, Wallace, Dehaan and Kelley violated Plaintiff's decedent's civil rights as identified herein, including by:

a.   Allowing Jeremy Kelley to remain out of police custody despite numerous violations of a PPO and despite Defendants' knowledge that Jeremy Kelley possessed firearms;

b.   Waiting to arrest Jeremy Kelley pursuant to an arrest warrant for domestic violence and mailing said warrant to Jeremy Kelley's residence;

c.   Speaking with Jeremy Kelley's father, Defendant Kelley, and listening to his efforts regarding leniency for his son;

23

    d. Other violations of Plaintiff's decedent's civil rights learned through the course of discovery.

118. Upon information and belief, Defendants violated Plaintiff's decedent's civil rights pursuant to an agreement with or in concert with Defendant Sean Kelley.

119. Defendants were acting within the course and scope of their employment as police officers when they conspired with Defendant Kelley.

120. As a result of the Defendants' actions and/or omissions, Plaintiff has the following damages:

    a. Special damages in the form of medical, funeral, and burial expenses;

    b. Compensatory damages;

    c. Conscious pain and suffering;

    d. Loss of companionship;

    e. Punitive damages;

    f. All damages allowable under Michigan law, including but not limited to the Michigan Wrongful Death Act, M.C.L. § 600.2922;

    g. All damages allowable under Federal law, including but not limited to 42 U.S.C. § 1983; and

    h. Reasonable costs and attorney's fees under 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff Pamela Reilly, as Personal Representative of the Estate of Rosemarie Reilly, prays for a judgment against Defendants,

RASOR LAW FIRM, PLLC

jointly and severally, including punitive damages and attorney's fees and costs pursuant to 42 U.S.C. § 1988, and all allowable interest thereon.

RESPECTFULLY SUBMITTED:

**THE RASOR LAW FIRM**

/s/ James B. Rasor_____
James B. Rasor (P43476)
Andrew J. Laurila (P78880)
Attorneys for Plaintiffs
201 E. Fourth Street
Royal Oak, Michigan 48067-3846
(248) 544-9300/(248) 543-9050 Fax
jbr@rasorlawfirm.com
Dated: October 5, 2018          ajl@rasorlawfirm.com

RASOR LAW FIRM, PLLC

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

PAMELA REILLY, as Personal Representative
for the Estate of ROSEMARIE REILLY,

     Plaintiff,

vs.

OTTAWA COUNTY, a Municipal
Corporation; OFFICER BRANDON
TUBERGEN, in his individual capacity;
SERGEANT CHRIS DILL, in his individual
capacity; POLICE OFFICER COLLIN
WALLACE, in his individual capacity;
SERGEANT DENNIS LUCE, in his individual
capacity; CAPTAIN BRANDON DEHAAN,
In his individual capacity; and SEAN
KELLEY, in his individual capacity,

     Defendants.

Case No. _____
Hon. _____

---

James B. Rasor (P43476)
Andrew J. Laurila (P78880)
**Rasor Law Firm, PLLC**
Attorneys for *Plaintiff*
201 E 4th Street
Royal Oak, MI 48067
(248) 543-9000/(248) 543-9050 (fax)
jbr@rasorlawfirm.com
ajl@rasorlawfirm.com

---

## **DEMAND FOR JURY TRIAL**

     **NOW COMES** Plaintiff, PAMELA REILLY, as Personal

Representative for the Estate of Rosemarie Reilly, by and through her attorneys,

RASOR LAW FIRM, PLLC, and hereby demands a trial by jury in the above-captioned cause of action.

RESPECTFULLY SUBMITTED:

THE RASOR LAW FIRM

/s/ James B. Rasor_____
James B. Rasor (P43476)
Andrew J. Laurila (P78880)
Attorneys for Plaintiffs
201 E. Fourth Street
Royal Oak, Michigan 48067-3846
(248) 544-9300/(248) 543-9050 Fax
jbr@rasorlawfirm.com
ajl@rasorlawfirm.com

Dated: October 5, 2018

27