UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAMELA REILLY, Personal Representative
of the Estate of Rosemarie Reilly,

      Plaintiff,

v.

COUNTY OF OTTAWA, et al.,

      Defendants.

_____/

Case No. 1:18-cv-1149

HON. JANET T. NEFF

## OPINION AND ORDER

Now pending before the Court in this case brought pursuant to 42 U.S.C. § 1983 are Defendants' Motions to Dismiss (ECF Nos. 49, 52 & 55). Having considered the parties' submissions, the Court concludes that oral argument is not necessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court grants Defendants' motions and closes this case.

## I.      BACKGROUND

This case arises from the undeniably tragic shooting death of Rosemarie Reilly (hereinafter "the decedent") on November 6, 2016 by her ex-boyfriend, Jeremy Kelley (hereinafter "Jeremy"), who then also fatally shot himself (Am. Compl. [ECF No. 8] ¶¶ 16, 77-79). On or about October 12, 2016, the decedent had contacted the police department of Grand Valley State University (GVSU), where she was then a student, and reported Jeremy for stalking, domestic violence/abuse and for putting a gun to her head and threatening to kill her (*id.* ¶ 37). Plaintiff, the decedent's mother, alleges that law enforcement thereafter "did nothing" to protect the decedent and,

conversely, that the actions they did take, which are delineated in detail *infra*, "either created the risk or increased the risk of danger to Rosemarie Reilly placing her in substantial risk of serious immediate and proximate harm which was the cause of her death" (*id.* ¶¶ 81 & 90).

On October 5, 2018, Plaintiff initiated this case, filing an Amended Complaint on November 2, 2018 against the following seven defendants: Ottawa County, Ottawa County Sheriff's Department (OCSD) Police Officer Eric Tubergen, and OCSD Sergeants Chris Dill and Dennis Luce (collectively "the Ottawa County Defendants"); GVSU Police Officer Collin Wallace and GVSU Police Captain Brandon DeHaan (collectively "the GVSU Defendants"); and Sean Kelley, Jeremy's father and an officer for the Bloomfield Township Police Department (ECF No. 8). Plaintiff alleges the following four claims:

I.  "Fourteenth Amendement [sic] Violations under 42 U.S.C. § 1983 as to (All/Individual) Defendants"

II.  "Municipal Liability as to Defendant Ottawa County"

III.  "Wrongful Death as to Defendants Tubergon [sic], Dill, Luce, Wallace, DeHaan and Kelley"

IV.  "Civil Conspiracy as to Defendants Tubergon [sic], Dill, Luce, Wallace, DeHaan and Kelley"

(*id.*). The Ottawa County Defendants answered Plaintiff's Amended Complaint (ECF No. 10). Defendant Kelley answered Plaintiff's Amended Complaint (ECF No. 33). The Court extended the time for the GVSU Defendants to answer the Amended Complaint until further Order (ECF No. 39).

Following a pre-motion conference in July 2019, and an attempt by the parties to settle the case, the Court issued an Order setting forth a briefing schedule on Defendants' proposed dispositive motions (ECF No. 39). In January 2020, Defendants filed their motions to dismiss

(ECF Nos. 49, 52 & 55), to which Plaintiff filed a collective response in opposition (ECF No. 59). Defendants filed their respective replies to Plaintiff's response (ECF Nos. 58, 60 & 61).

## II.    ANALYSIS

### A.    Motion Standard

Defendants seek dismissal under Federal Rule of Civil Procedure 12(b)(6), which authorizes a court to dismiss a complaint if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6).  Specifically, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007).  The court views the complaint in the light most favorable to the plaintiff, accepting as true all well-pled factual allegations and drawing all reasonable inferences in favor of the plaintiff.  *Gavitt v. Born*, 835 F.3d 623, 639-40 (6th Cir. 2016).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### B.    Discussion

**1.    Count I—"Fourteenth Amendement [sic] Violations under 42 U.S.C. § 1983 as to (All/Individual) Defendants"**

In Count I, Plaintiff alleges that Defendants, in their individual capacities, deprived the decedent of her "clearly established right, under the Fourteenth Amendment to the United States Constitution, to be free from danger created by the state" (Am. Compl. ¶¶ 93-94).  Plaintiff alleges that Defendants' acts and/or omissions constituted deliberate indifference to this right, and that their deliberate indifference was "a proximate cause of [the decedent's] death and conscious suffering" (*id.* ¶¶ 95 & 98).

In support of dismissal of Count I, GVSU Defendants DeHaan and Wallace argue that any alleged failure on their part to protect the decedent from Jeremy did not violate the decedent's substantive due process rights because, under *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 197 (1989), "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause" (ECF No. 50 at PageID.300).

The Ottawa County Defendants argue that processing arrest warrants in the face of a criminal complaint is "what law enforcement officers typically do and should do anytime a person like Rosemarie complains to them about an assault and battery" and that Plaintiff has failed to allege any facts showing that they acted with deliberate indifference in handling the decedent's case (ECF No. 53 at PageID.325-327). They also point out that Jeremy's possessive, stalking, and violent tendencies pre-dated their involvement in the case and had already prompted both Plaintiff and the decedent to seek intervention of the law enforcement and court system through the PPO, facts that do not support Plaintiff's claim that Defendants' actions "created" or "increased" the risk of harm to the decedent (*id.* at PageID.325-326).

Defendant Kelley asserts that Plaintiff's claim "does not apply" to him because he was acting as Jeremy's father, not as a state actor acting under "color of state law" as required for a § 1983 claim (ECF No. 56 at PageID.343-344). Defendant Kelley argues that even if he was a state actor, Plaintiff alleges only an unsubstantiated and inadmissible phone call with OCSD police officers, which is not an affirmative act that could be seen as putting the decedent in any special danger or distinguished risk (*id.* at PageID.345-346).

Defendants collectively argue that they are also entitled to qualified immunity on Count I where (a) they did not plausibly violate any constitutional right of the decedent; and (b) even if the decedent's constitutional rights were somehow violated, there are no cases finding a constitutional

right to be free from an increased risk of harm under these exact (or even vaguely similar) circumstances (ECF No. 50 at PageID.306-307; ECF No. 53 at PageID.327; ECF No. 56 at PageID.345).

In response, Plaintiff argues that the affirmative acts of GVSU Defendants DeHaan and Wallace, as specifically pled, constitute a "series of impermissible communications and acts" that emboldened Jeremy, led to Jeremy's belief that he was "outside of the reach of the law," and increased the decedent's risk of harm (ECF No. 59 at PageID.377-391). Plaintiff argues that the allegations are sufficient to plead a *DeShaney* claim against them (*id.* at PageID.391). Plaintiff argues that the alleged conduct by the OCSD officers, including mailing Jeremy the arrest warrant and assuring Jeremy and his father that Jeremy would not be arrested, also meets the *DeShaney* affirmative-act standard (*id.* at PageID.391-394). As to Defendant Kelley, Plaintiff posits that "[g]iven the alleged facts and the degree of indifference the individual Defendants took to this matter, it seems probable that Sean Kelley acted in his official capacity as an officer, and not a parent" (*id.* at PageID.402-403). Last, Plaintiff argues that Defendants' attempt to "hide behind qualified immunity" is disingenuous because "a reasonable officer would have known that acting in a manner that emboldened an abuser and permitted an abuser to act with impunity in the face of escalating, criminal conduct unconstitutionally increased the risk to the abused" (*id.* at PageID.394-396).

Defendants' arguments have merit.

Plaintiff's Fourteenth Amendment claim in Count I is brought under 42 U.S.C. § 1983. Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States. *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010). Specifically, § 1983 provides a cause of action against a government official who

performs discretionary duties in a manner that deprives an individual of a right secured by the Constitution or laws of the United States, if the right was clearly established at the time of the deprivation. *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 418 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To state a claim under 42 U.S.C. § 1983, "'a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" *Scott v. Kent Cty.*, 679 F. App'x 435, 438 (6th Cir. 2017) (citation omitted).

"Government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties, provided 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Simmonds v. Genesee Cty.*, 682 F.3d 438, 443 (6th Cir. 2012) (quoting *Harlow*, 457 U.S. at 818). The Sixth Circuit recently reiterated that "despite the general preference to save qualified immunity for summary judgment, sometimes it's best resolved in a motion to dismiss," which "happens when the complaint establishes the defense." *Siefert v. Hamilton Cty.*, 951 F.3d 753, 762 (6th Cir. 2020). At the pleading stage, the ultimate test is whether, reading the Amended Complaint in the light most favorable to Plaintiff, it is plausible that the individual Defendants' acts or omissions violated her clearly established constitutional rights. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Osberry v. Slusher*, 750 F. App'x 385, 392 (6th Cir. 2018); *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

This is a "two-tiered inquiry" that requires the court to (1) "determine if the facts alleged make out a violation of a constitutional right" and (2) "ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Osberry, supra* (quoting *Martin v. City of Broadview Hts.*, 712 F.3d 951, 957

(6th Cir. 2013)).  The court can address these questions in either order but must answer both questions in the affirmative for a plaintiff's complaint to survive.  *Id.*

Plaintiff alleges the deprivation of the decedent's rights under the Due Process Clause of the Fourteenth Amendment, which protects persons against State deprivations "of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV.  The United States Supreme Court has instructed that even in the face of "undeniably tragic" and "calamitous" circumstances, "[a]s a general matter, ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 191.  But the Supreme Court acknowledged that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," "leaving the door open for another set of 'limited circumstances' that would give rise to a state's affirmative duty to protect when it noted that 'while the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 198, 201).

The Sixth Circuit, like other circuits, has since recognized a "state-created-danger theory of constitutional liability under § 1983." *McQueen, supra.*  The parties agree, and the Sixth Circuit recently reiterated, that the elements of a properly pleaded "state-created danger" are the following:

> 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Lipman v. Budish*, No. 19-3914, 2020 WL 5269826, at *13 (6th Cir. Sept. 4, 2020) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

"Plaintiffs who seek to hold state officials constitutionally liable on a 'failure-to-protect' claim face a high burden under *DeShaney*." *Engler v. Arnold*, 862 F.3d 571, 576 (6th Cir. 2017). On numerous occasions, the Sixth Circuit has rejected claims because the challenged conduct either "was not an affirmative act at all or did not create or increase the risk of private violence to the plaintiff." *McQueen*, 433 F.3d at 465 (citing cases). *See also Jones v. Reynolds*, 438 F.3d 685, 688 (6th Cir. 2006) (observing that "when a claimant argues that government officials failed to prevent private individuals from causing another injury, *DeShaney* . . . and its progeny rarely permit the claim to go forward").

Important to the analysis is the rule that "[a]n assertion of a failure to act does not support a state-created-danger theory[.]" *Engler*, 862 F.3d at 576. Instead, a plaintiff "must point to conduct which either created or increased the risk of harm, and show not only that [s]he could have been saved, but also that [s]he was safer *before* the state action than [s]he was *after* it." *Id.* at 575 (citation and quotation marks omitted) (emphases in original). *See also Koulta v. Merciez*, 477 F.3d 442, 445-46 (6th Cir. 2007) ("Rather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or [inaction], we have focused on whether the victim was safer before the state action than [she] was after it.").

Here, Plaintiff alleges that before the decedent contacted any Defendants or any Defendants took any actions, Jeremy:

- attempted to commit suicide on October 5, 2016 (Am. Compl. ¶ 20);

- stalked and harassed the decedent so persistently that she moved out of their shared residence (*id.* ¶¶ 19, 23, 25);

- physically assaulted the decedent to prevent her from leaving: "punch[ing] her in the face, arms, and legs several times, causing her broken nose among other injuries" (*id.* ¶¶ 28-30);

- called the decedent approximately 43 times from October 8 through October 11, 2016 (*id.* ¶ 31);

- held a gun to his own head and threatened to kill himself after failing to locate the decedent on October 11, 2016 (*id.* ¶ 33);

- jumped in front of the decedent's car on October 12, 2016, "pounding on the window and head-butting her vehicle" (*id.* ¶ 36); and

- put a gun to the decedent's head on October 12, 2016 and "threaten[ed] to kill her" (*id.* ¶ 37).

As Defendants point out (ECF No. 61 at PageID.420), "Jeremy's suicidal tendencies and homicidal tendencies toward Rosemarie predated Defendants' involvement in this case."

On October 12, 2016, the decedent contacted GVSU's police department, and the affirmative acts that Plaintiff alleges the individual Defendants thereafter committed are as follows. Against GVSU Officer **Wallace**, Plaintiff alleges that Wallace

1. "completed a 'no trespassing' form for Jeremy along with creating an incident report based on stalking arising from the circumstances Rosemarie told him about" and "affirmatively suggested Rosemarie file a PPO against Jeremy" (Am. Compl. ¶¶ 37, 40);

2. contacted the OCSD, which dispatched Sergeant Dill to the GVSU campus to give the decedent the PPO paperwork (*id.* ¶ 38); and

3. mailed Jeremy a warrant for his arrest on or around November 2, 2016, a warrant arising out of the decedent's complaint of his stalking (*id.* ¶ 71).

Against OCSD Sergeant **Dill**, Plaintiff alleges that Dill

1. gave the decedent paperwork for a PPO and "encouraged" her to file it (*id.* ¶¶ 38-39);

2. took the decedent's report on October 13, 2016 of being threatened with a gun (*id.* ¶ 46); and

3. called Jeremy on October 13, 2016 about the decedent's complaint of domestic violence and informed Jeremy that he was "not going to take Jeremy to jail" (*id.* ¶ 47.)

Against OCSD Officer **Tubergen**, Plaintiff alleges that Tubergen

1. visited Jeremy on October 13, 2016 and told him to "leave Rosemarie alone" (*id.* ¶¶ 41-42);

2. called Plaintiff after visiting Jeremy and told her that "there was nothing that could be done to prevent Jeremy from calling Rosemarie, that he had seen Jeremy's guns and that Jeremy was legally allowed to own those guns, and that he was 'well aware' that Jeremy's father, Sean Kelley, was a police officer" (*id.* ¶ 43); and

3. told Plaintiff that the decedent needed to file a report about Jeremy holding a gun to the decedent's head (*id.* ¶ 45).

Against OCSD Sergeant **Luce**, Plaintiff alleges that Luce

1. took Plaintiff's phone call expressing concern regarding retrieving the decedent's belongings from Jeremy's trailer because of the presence of firearms with which Jeremy had threatened the decedent (*id.* ¶ 54); and

2. told Jeremy's father that "Jeremy was allowed to have guns and that there was no cause to remove them" (*id.* ¶ 55).

Against GVSU Police Captain **DeHaan**, Plaintiff alleges that DeHaan

1. reviewed the October 13, 2016 reports of GVSU Officer Wallace and OCSD Sergeant Dill (*id.* ¶ 49);

2. took Plaintiff's phone call expressing concern about Jeremy stalking the decedent and Jeremy's guns and that Jeremy's father may "offer[] Jeremy bad advice regarding the situation" (*id.* ¶ 50); and

3. spoke to Jeremy on October 13, 2016 and told Jeremy he "was banned from GVSU property, was not allowed [] to enter any GVSU property, and not to contact any of the Reilly family members by phone, e-mail or any other electronic means" (*id.* ¶¶ 52-53).

Against Defendant **Kelley**, Plaintiff alleges only that "[u]pon information and belief, Jeremy's father, Defendant Kelley, had spoken with officer(s) from Defendant OCSD prior to this encounter and on behalf of his son" (*id.* ¶ 57).

Last, Plaintiff also generally alleges against no particular Defendant that

- "[a] warrant was prepared by Defendant OCSD for Jeremy's arrest on October 28, 2016, arising out of Rosemarie's report of domestic violence," and "[p]ursuant to Defendant OCSD's policies, this warrant was mailed to Jeremy's residence" (*id.* ¶¶ 69-70); and

- "[u]pon information and belief, either Jeremy's father or one of the Defendant police officers in the area also informed Jeremy he had a warrant

for his arrest relating to the domestic violence incident but did not effectuate his arrest" (*id.* ¶ 76).

As a threshold matter, many of the actions taken by Defendants—creating incident reports, giving the decedent paperwork, telling the decedent and Plaintiff to file reports, taking Plaintiff's phone calls, reviewing reports—are not acts that increased the preexisting danger to the decedent but are acts that arguably made her safer. And the remainder of the acts alleged by Plaintiff are insufficient to state a *DeShaney* claim.

Again, a failure to act is not an affirmative act under the state-created-danger theory. *See Engler*, 862 F.3d at 576. "This is so, even where officers can be seen not only to have ignored or disregarded the risk of injury, but to have condoned it." *Brooks v. Knapp*, 221 F. App'x 402, 407 (2007). *See also Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 854-55 (6th Cir. 2016) (citing cases for the proposition that merely "ignoring a dangerous situation is usually not an affirmative act and, furthermore, usually cannot increase a preexisting danger"). And no "affirmative duty to protect arises ... from the State's ... expressions of intent to help" an individual at risk. *DeShaney*, 489 U.S. at 200. Accordingly, any alleged failure by Defendants to take Jeremy into custody, take away his firearm or otherwise fail to "follow up" is not actionable under § 1983. *See, e.g., Culp v. Rutledge*, 343 F. App'x 128, 135-36 (6th Cir. 2009) ("any failure by Sergeant Cooper to follow up on Jamika's domestic violence claim constitutes *inaction*, which does not qualify as an affirmative act under a state-created danger theory") (emphasis in original); *Brooks,* 221 F. App'x at 406 ("Officer Drumb's failure to do anything other than to detain Mr. Hernandez briefly on the night before he killed Mrs. Hernandez is not actionable").

Similarly, under the caselaw, the alleged failure by GVSU Officer Wallace and/or the OCSD officers to personally serve the arrest warrants in this case is also not an affirmative act that states a plausible *DeShaney* claim. *See, e.g., Jones v. Union Cty.*, 296 F.3d 417, 430-31 (6th Cir.

2002) (failure to timely serve ex parte PPO on ex-husband was not actionable under *DeShaney*, even though "the Sheriff's Department was well aware of the seriousness of the domestic problems involving [p]laintiff and her ex-husband").

Last, Defendants' conversations with Jeremy, notifying him of the decedent's report and/or telling him he was not going to be arrested, are also insufficient to state a *DeShaney* claim. *See, e.g., Brooks*, 221 F. App'x at 406 (holding that the defendant-officers did not do anything "affirmative" to "embolden" the ex-husband by interrogating him but failing to arrest him on the night of the murder); *May v. Franklin Cty. Comm'rs*, 437 F.3d 579, 584-86 (6th Cir. 2006) (officers who merely depart from the scene of a domestic violence call without having taken steps to reduce the risk of harm cannot be held liable under the "state-created danger" exception to *DeShaney*).

In sum, Plaintiff's allegations in Count I fail to state a claim against any of the individual Defendants because (1) their alleged failures to act do not support a state-created-danger theory, and (2) the affirmative acts Plaintiff delineates did not plausibly increase the preexisting danger to the decedent. Count I is therefore properly dismissed for failure to state a claim. Because the alleged facts do not make out a violation of a constitutional right, Defendants are also entitled to qualified immunity. *See Pearson, supra*; *Osberry, supra.*

The Court briefly states that even if Count I was not properly dismissed against Defendant Kelley for failure to state a claim, Plaintiff has not demonstrated that this § 1983 claim is properly brought against him. "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmonson Oil. Co.*, 457 U.S. 922, 936 (1982). "It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Id.*

Plaintiff does not allege in her Complaint why Defendant Kelley's challenged conduct may be fairly attributable to the State for purposes of her § 1983 claim against him. *See generally Vistein v. Am. Registry of Radiologic Technologists*, 342 F. App'x 113, 127 (6th Cir. 2009) (describing the four tests the Supreme Court has established for determining whether challenged conduct may be fairly attributable to the State for purposes of a § 1983 claim). And in briefing, she proffers only the general proposition that "a public official acts under color of state law when she has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law" (ECF No. 59 at PageID.402, quoting *West v Atkins*, 487 U.S. 42, 49 (1988)). As Defendant Kelley points out (ECF No. 58 at PageID.354), *West* involved a private physician who was under contract with the State to provide medical services to inmates at a state-prison hospital and is not relevant to the facts of the case at bar. Plaintiff's submission that Defendant Kelley was acting "under color of state law" for purposes of her § 1983 claim against him in Count I is not convincing, and the failure to satisfy this element provides an additional basis for dismissal of the claim against this Defendant.

**2. Count II—"Municipal Liability as to Defendant Ottawa County"**

In Count II, which is also brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Defendant Ottawa County, "through their policy making officials:"

 a. Failed to establish, implement, and/or execute adequate policies, procedures, rules and regulations to protect individuals, such as Rosemarie Reilly, from individuals with violent tendencies or who had PPOs against them;

 b. Failed to establish, implement, and/or execute adequate policies, procedures, rules and regulations to protect individuals, such as Rosemarie Reilly, from individuals against whom arrest warrants had been issued.

 c. Defendant's policy, procedures, regulations, and customs, and/or its failure to enact the same, caused and was the driving force behind the violations of Plaintiff's constitutional rights as alleged in this Complaint.

    d.   Failing to properly train its employees, including the above-named Defendant.

    e.   Failed to establish, implement, and/or execute adequate policies, procedures, rules and regulations that ensured officers from different police departments—Defendant Kelley—could improperly influence investigations and/or police conduct.

(Am. Compl. ¶ 104). Plaintiff alleges that Defendant Ottawa County's customs, policies and/or practices were "a proximate cause of the death and conscious suffering of Plaintiff's decedent" (*id.* ¶ 107).

In support of dismissal of Count II, the Ottawa County Defendants argue that without an underlying constitutional violation against the individual officers, there can be no municipal liability for the County (ECF No. 53 at PageID.328). The Ottawa County Defendants also argue that Plaintiff has failed to allege facts identifying a municipal policy or custom that was the moving force behind those injuries (*id.*). Last, they point out that Plaintiff's Amended Complaint is devoid of any allegations of any conduct by any party to the case outside of the instant case, let alone any allegation that PPOs and arrest warrants for battery issued in the past have created an unconstitutional pattern of causing more acts of domestic violence in Ottawa County, such that the Ottawa County Sheriff should take particular, specific training actions (*id.* at PageID.331).

In response, Plaintiff argues that "the de facto policy of allowing Sean Kelley's intervention, the actual policy of mailing arrest warrants and not taking action and the de facto policy of providing assurances to perpetrators they will not be arrested despite committing crimes undeniably played a role here" (ECF No. 59 at PageID.400-401). Plaintiff also argues that "there is a reasonable basis that Defendants were inadequately trained to the extent they did not know how to properly handle OCSD's arrest warrant procedures and/or they were not trained to be persuaded by outside police influences like Sean Kelley" (*id.* at PageID.401). However, Plaintiff

also "cedes that the availability of her municipal liability claim under *Monell* . . . first hinges on a finding of unconstitutionality from the named individual defendants" (*id.* at PageID.400).

The Ottawa County Defendants' arguments have merit.

Counties and other local governments are not vicariously liable in § 1983 actions "merely because they employ someone who has committed a constitutional violation." *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)). Rather, municipalities "must pay for violations only if the injury is caused by a municipal custom or policy, or if the city's failure to train employees amounts to deliberate indifference to constitutional rights." *Id.* "[W]here there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability." *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019). *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point."); *see also Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").

Given this Court's holding that Count I is properly dismissed, Count II is likewise properly dismissed. Moreover, Plaintiff fails to allege more than a single instance of a substantive due process violation like that alleged in this case. "A failure-to-train claim … requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). In short, Plaintiff fails to state a plausible *Monell* claim against Ottawa County.

3.     **Count III—"Wrongful Death as to Defendants Tubergon [sic], Dill, Luce, Wallace, DeHaan and Kelley"**

In Count III, Plaintiff alleges that the acts and/or omissions of Defendants Tubergen, Dill, Luce, Wallace, DeHaan and Kelley constitute gross negligence under state law and that their gross negligence was "a proximate cause" of the decedent's injuries, including her wrongful death (Am. Compl. ¶¶ 112 & 114).

In support of dismissal of Count III, Defendants collectively argue that Plaintiff has not sufficiently pleaded a wrongful death claim to avoid governmental immunity where she expressly alleges only that Defendants' alleged conduct was "a" proximate cause of the decedent's injuries and "the one most immediate, efficient, and direct cause" of the decedent's injuries was clearly Jeremy's conduct (ECF No. 50 at PageID.309-311; ECF No. 53 at PageID.331-332; ECF No. 56 at PageID.346-347).

In response, Plaintiff argues that the pleadings alone show that Defendants' "individualized, collective conduct" increased the decedent's risk of harm and that "merely because Jeremy killed Rosemarie does not firmly establish Defendants' conduct was not the 'proximate cause'" (ECF No. 59 at PageID.397). Plaintiff argues that Jeremy's conduct in murdering the decedent was "undeniably foreseeable in light of Defendants' actions in emboldening and failing to arrest Jeremy for escalating criminal behavior involving Rosemarie" (*id.* at PageID.398-399).

Defendants' arguments have merit.

Michigan's wrongful death statute provides that

[w]henever the death of a person . . . shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation that would have been liable, if death had not ensued, shall be liable to an action for damages . . . .

MICH. COMP. LAWS § 600.2922(1).

Under Michigan's governmental immunity statute, however, an officer is immune from tort liability when the following three requirements are met:

> (1) the officer "is acting or reasonably believes he or she is acting within the scope of his or her authority," (2) "[t]he governmental agency is engaged in the exercise or discharge of a governmental function," and (3) the officer's "conduct does not amount to gross negligence that is the proximate cause of the injury or damage."

MICH. COMP. LAWS § 691.1407(2). The Michigan Supreme Court long ago defined "the proximate cause" as "the immediate efficient, direct cause preceding the injury." *Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000) (quoting *Stoll v. Laubengayer*, 140 N.W. 532, 534 (Mich. 1913)). The Michigan Supreme Court has instructed that "a proper proximate cause analysis must assess foreseeability and the legal responsibility of the relevant actors to determine whether the conduct of a government actor, or some other person, was 'the proximate cause,' that is, as our caselaw has described it, 'the one most immediate, efficient, and direct cause' of the plaintiff's injuries." *Ray v. Swager*, 903 N.W.2d 366, 369 (Mich. 2017). As the Sixth Circuit has observed, "proximate cause is a high bar" under the statute. *Walker v. Detroit Pub. Sch. Dist.*, 535 F. App'x 461, 467 (6th Cir. 2013).

Plaintiff's pleading does not meet this high bar. As Defendants point out, Plaintiff expressly alleges in her Amended Complaint that the alleged conduct of Defendants was "a proximate cause," not the proximate cause of the decedent's injuries. And, viewing the Amended Complaint in the light most favorable to Plaintiff, accepting as true all well-pled factual allegations and drawing all reasonable inferences in favor of Plaintiff, "the one most immediate, efficient, and direct cause" of the decedent's injuries was clearly Jeremy's conduct, not any alleged actions or inactions by Defendants. *See* Am. Compl. ¶ 16 ("Rosemarie was shot and killed at approximately

3:00 a.m. on November 6, 2016 by her ex-boyfriend, Jeremy Kelley . . . .").  Plaintiff has therefore

not pleaded a plausible wrongful death claim in avoidance of governmental immunity.

### 4. Count IV—"Civil Conspiracy as to Defendants Tubergon [sic], Dill, Luce, Wallace, DeHaan and Kelley"

Last, in Count IV, Plaintiff alleges that, "[u]pon information and belief, Defendants

[Tubergen, Dill, Luce, Wallace, and DeHaan] violated Plaintiff's decedent's civil rights pursuant

to an agreement with or in concert with Defendant Sean Kelley" (Am. Compl. ¶ 118).  Plaintiff

identifies the following three alleged civil rights violations:

> a. Allowing Jeremy Kelley to remain out of police custody despite numerous violations of a PPO and despite Defendants' knowledge that Jeremy Kelley possessed firearms;
>
> b. Waiting to arrest Jeremy Kelley pursuant to an arrest warrant for domestic violence and mailing said warrant to Jeremy Kelley's residence; [and]
>
> c. Speaking with Jeremy Kelley's father, Defendant Kelley, and listening to his efforts regarding leniency for his son;

(Am. Compl. ¶ 117).

In support of dismissal of Count IV, Defendants collectively argue that Plaintiff's civil

conspiracy claim fails because (1) for the reasons stated *supra*, she cannot establish any underlying

deprivation of a constitutional right; and (2) her conclusive and speculative allegations only hint

at the possibility of a conspiracy (ECF No. 50 at PageID.312-314; ECF No. 53 at PageID.331-332;

ECF No. 56 at PageID.347-348).[1]  The GVSU Defendants also emphasize that Plaintiff fails to

identify any single plan to which Defendants were all allegedly privy and that there is no allegation

---

[1] Defendant Kelley also reiterates his argument that he cannot be liable under § 1983 as a private actor (ECF No. 53 at PageID.348); however, this argument is misplaced in this context. *See Cooper v. Parrish*, 203 F.3d 937, 952 n. 2 (6th Cir. 2000) ("If a private party has conspired with state officials to violate constitutional rights, then that party qualifies as a state actor and may be held liable pursuant to § 1983 ...")

whatsoever as to what "conspiratorial objective" Defendants supposedly sought to achieve (ECF No. 50 at PageID.313).

In response, Plaintiff argues that Defendants' "'plan' is clear based on the well-pled facts," to wit: "to ensure Jeremy Kelley remained free from arrest" (ECF No. 59 at PageID.405-406).

Defendants' arguments have merit.

Although it is unclear from Plaintiff's Amended Complaint or briefing whether Plaintiff's civil conspiracy claim is brought under § 1983 or Michigan law, it is clear that the claim fails under both federal and state law. The elements of a civil conspiracy under § 1983 are that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Womack v. Conley*, 595 F. App'x 489, 494 (6th Cir. 2014) (citation omitted). Under Michigan law, a civil conspiracy is "a combination of two or more persons, [who] by some concerted action, [agree] to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Fenestra Inc. v. Gulf American Land Corp.*, 141 N.W.2d 36, 48 (Mich. 1966); *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992).

"Section 1983 does not ... punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises." *Abdullah v. Harrington*, 37 F.3d 1498 (6th Cir. 1994) (citation omitted). Similarly, a civil conspiracy claim under Michigan law "cannot 'exist in the air.'" *Rondigo, L.L.C. v. Twp. of Richmond, Mich.*, 522 F. App'x 283, 287 (6th Cir. 2013) (quoting *Early Det. Ctr., P.C. v. New York Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986)). *See also Fenestra*, 141 N.W.2d at 49 ("The conspiracy standing alone without the commission of acts causing damage would not be actionable.").

Here, as Defendants point out, Plaintiff's claim that Defendants agreed to violate the decedent's delineated civil rights fails at the outset where Plaintiff has not stated a plausible civil rights violation under federal law. For the reasons previously stated, "[a]llowing Jeremy Kelley to remain out of police custody," "[w]aiting to arrest Jeremy Kelley," and "[s]peaking with Jeremy Kelley's father, Defendant Kelley, and listening to his efforts regarding leniency for his son" do not state a substantive due process violation. And Plaintiff fails to identify, let alone demonstrate, the predicate tort upon which any state-law conspiracy claim would rely. *See, e.g., Dauenhauer v. Bank of New York Mellon*, 562 F. App'x 473, 483 (6th Cir. 2014) (affirming dismissal of state-law civil conspiracy claim where there was no underlying tort claim).

Additionally, Plaintiff's claim fails because she provides only "naked assertion[s] devoid of further factual enhancement," which are insufficient to survive the motion-to-dismiss stage. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556-59. Plaintiff fails to state any "plausible, non-conclusory facts to demonstrate that [the defendants] joined [the] conspiracy, shared in the conspiratorial objective, and/or committed specific acts in furtherance of the conspiracy." *See Boxill v. O'Grady*, 935 F.3d 510, 519 (6th Cir. 2019). Plaintiff merely states that Defendants were in agreement or "in concert" to violate the decedent's civil rights. Legal conclusions that are "masquerading as factual allegations" do not suffice. *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (citation omitted) (affirming dismissal of conspiracy claim where the amended complaint contained allegations about the defendants "conferring with one another at different points" but did not contain "specific allegations of a plan or agreement"); *see also Bickerstaff v. Lucarelli*, 830 F.3d 388, 401 (6th Cir. 2016) (affirming dismissal of civil conspiracy claim where the plaintiff failed to allege any facts indicating that the defendants were in a common

plan).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal, supra.*

In sum, Plaintiff's conspiracy claim is properly dismissed.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss (ECF Nos. 49, 52 & 55) are GRANTED, and Plaintiff's Amended Complaint is DISMISSED.

Dated:  September 21, 2020                                          /s/ Janet T. Neff                          
                                                                                JANET T. NEFF
                                                                                United States District Judge